Allen Kronenberger, Esq. (SBN 297194)
allen@akronenberger.com
THE LAW OFFICE OF ALLEN KRONENBERGER
7083 Hollywood Blvd. 4th Fl.
Los Angeles, CA 90028
Telephone: (213) 618.0923
Fax: (213) 402.3323

Attorney for Plaintiffs
HELEN NADEL
SOUND PLUS LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HELEN NADEL, as an individual, and<br>SOUND PLUS LLC, a California limited liability company;<br><br>      Plaintiffs,<br>    v.<br><br>ANTHONY BUCHER, an individual,<br>GRACIE PRODUCTIONS, a fictitious business name,<br>SEVEN13 MUSIC & ENTERTAINMENT, a fictitious business name,<br>HYPETURE LLC, a fictitious business name,<br>STEPHANIE GRAY, as an individual,<br>DORIAN WASHINGTON, as an individual, and<br>DOE, as an individual.<br><br>      Defendants. | Case No.:<br><br>COMPLAINT FOR DAMAGES FOR:<br><br>1. FOUR COUNTS OF BREACH OF CONTRACT<br>2. COMMON COUNTS<br>3. FRAUD BY INTENTIONAL MISREPRESENTATION<br>4. FRAUD BY NEGLIGENT MISREPRESENTATION<br><br>JURY TRIAL DEMANDED |

1

## COMPLAINT FOR A CIVIL CASE

Plaintiffs, HELEN NADEL ("Ms. Nadel") and SOUND PLUS LLC ("Sound Plus") (collectively "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint for damages against the Defendants, and allege as follows:

## PARTIES

1.     Plaintiff HELEN NADEL ("Ms. Nadel") is a recording artist, performing by the name of Nadel Paris, and is and was a resident of the State of California at all times of the material to this Complaint.

2.     Plaintiff SOUND PLUS LLC ("Sound Plus") is a California limited liability company co-owned by Ms. Nadel that is and was authorized to conduct business in the State of California at all times of the material to this Complaint with a principal place of business located in Orange County, California.

3.     Defendant ANTHONY BUCHER ("Bucher") is a male individual who is and was, to the best knowledge of the Plaintiffs, a resident of the State of Florida at all times material to Complaint and the owner of GRACIE PRODUCTIONS and SEVEN13 MUSIC & ENTERTAINMENT.

4.     Defendant GRACIE PRODUCTIONS ("Gracie"), prior to any time material to this Complaint, was an LLC authorized to do business in the State of Indiana where it dissolved after filing for bankruptcy. At all times material to this

Complaint, Gracie was an unregistered, fictitious business in the State of Florida from which Bucher owned and operated as an individual.

5. Defendant SEVEN13 MUSIC & ENTERTAINMENT ("Seven13") is an unregistered, fictitious business in the State of Florida that is and was at all times material to this Complaint owned and operated by Bucher as an individual.

6. Defendant HYPETURE LLC ("Hypeture") purported to be a limited liability company authorized to do business in the State of Louisiana; however, after extensive background research, to the best knowledge of the Plaintiffs Hypeture is an unregistered, fictitious business.

7. Defendant STEPHANIE GRAY ("Gray") is allegedly a female individual who owned and operated Hypeture; however, after extensive background research, to the best knowledge of the Plaintiffs, Stephanie Gray does not exist in relation to Hypeture or to the occurrences in this Complaint.

8. Defendant DOE ("Doe") is and was, to the best knowledge of the Plaintiffs, the actual owner and operator of Hypeture, and is an individual that is a resident completely diverse to the Plaintiffs.

9. Defendant DORIAN WASHINGTON ("Washington") is a male individual who is and was, to the best knowledge of the Plaintiffs, a resident of the State of Florida at all times material to Complaint.

## JURISDICTION

3

10.     Plaintiffs bring the complaint under federal diversity jurisdiction, 28 U.S.C. 1332., as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

11.     Venue in the Central District of California is proper because Defendant Bucher contractually agreed to venue in Los Angeles, California, and all actions relating to this Complaint occurred within the Central District of California.

## STATEMENT OF FACTS

12.     Ms. Nadel is an independent music-recording artist by the name of Nadel Paris. In 2014, after recording new music, Ms. Nadel began searching for individuals and companies with experience in the music industry to help distribute, promote, and otherwise exploit her music and launch her music career.

13.     Ms. Nadel registered with the website MusicXRay.com, a website to connect independent artists with music distributors, promoters, and other music companies. After registering, she submitted one of her new songs, titled "Oh La La La" (the "Single") to the website.

14.     Defendant Gracie, and its owner Defendant Bucher, is a registered company on MusicXRay.com. Gracie's profile states that it is the 5th largest independent record label in the U.S., and has worked with major labels and artists such as Eminem and Lil Wayne.

15.    Ms. Nadel found Gracie on MusicXRay.com, where she contacted Bucher directly, and submitted her music to him. Bucher responded favorably, and indicated that he wanted to distribute the Single through Gracie.

### (The First Contract – The Distribution Agreement)

16.    Following their initial conversation, Bucher explained to Ms. Nadel that Gracie has a pre-existing relationship with the Universal Music Group ("UMG"), one of the largest music companies in the world. Bucher told Ms. Nadel that UMG also had interest, and would be contributing significant finances towards the Single to help promote and exploit the music.

17.    Ms. Nadel was ecstatic for the opportunity to be working with the 5th largest independent record label in the U.S. as well as UMG, so in early 2015, Bucher proceeded to email a music distribution contract (the "Distribution Agreement") to Ms. Nadel.

18.    The terms of the Distribution Agreement were fairly simple. Gracie would distribute the Single through its network, and in consideration of Gracie's services, Gracie would retain 20% of the net proceeds of the revenue received by Gracie.

19.    However, the Distribution Agreement was silent on the methods for which Gracie would distribute and promote, and did not mention UMG. By email,

Bucher stated he did not want to insert every method of promotion into the
Distribution Agreement.

20.    Additionally, to start the contract, Bucher required that Ms. Nadel
send Gracie a check for $15,000. For future expenses, Ms. Nadel and Gracie
verbally agreed that costs would be advanced by UMG, Gracie, and/or Ms. Nadel,
and those costs would be recouped from the money earned.

21.    Ms. Nadel did negotiate directly into the Distribution Agreement
explicit language that required Gracie to maintain records of the costs and how
money was spent on the Single, and that Gracie would provide Ms. Nadel with
such records of marketing costs, third party costs, and Gracie expenses upon her
request. Additionally, Gracie agreed to provide quarterly statements and payments
to Ms. Nadel indicating money earned.

22.    Bucher accepted these additions, and Ms. Nadel promptly executed
and delivered the Distribution Agreement to Bucher. On March 12, 2015, Bucher
emailed Ms. Nadel, stating the "[s]igned agreement is attached." However there
was no attachment, which Ms. Nadel only later realized.

23.    Upon receiving this email, Ms. Nadel proceeded to mail Gracie a
check for $15,000, as requested by Bucher. Gracie accepted the check and then
both Ms. Nadel and Gracie moved forward under the terms of the Distribution
Agreement.

**(Gracie's Services Under the Distribution Agreement)**

24.    Upon Gracie's acceptance of the $15,000 check, Ms. Nadel sent Bucher the digital file for the Single, and Bucher uploaded the Single for digital distribution through sites such as iTunes, Spotify, and Pandora. While the Distribution Agreement was specific to the Single, Ms. Nadel did send other music to Bucher, and over the course of the Distribution Agreement, the services provided expanded to cover this additional music.

25.    In addition to initial $15,000 check, Bucher continued to request more money from Ms. Nadel. Bucher's technique to get more money from Ms. Nadel generally involved sending Ms. Nadel encouragement and positive reactions to her music from various third parties, such as UMG, with comments stating that these third parties all loved her music. Additionally, these money requests would often include financial commitments from either Gracie or the third parties, such as UMG, and Ms. Nadel would only have to pay for a portion of the actual costs up front.

26.    The money requests varied from a few hundred dollars to a few thousand dollars at a time, and Ms. Nadel, who was happy that there was such a positive reaction to her music, was more than happy to oblige. She even sold her house in order to meet all his financial requests. In total, Ms. Nadel sent Bucher $129,978.61 under the Distribution Agreement.

27.    UMG was the primary source of encouragement used by Bucher to influence Ms. Nadel to send him more money. There are several emails between Bucher and Ms. Nadel about UMG, and some of the specific conversations include:

28.    On July 14, 2015, Bucher wrote to Ms. Nadel that UMG had agreed to give Ms. Nadel $40,000 as a budget for radio promotion, but that UMG would not give the money until August, so "a few more things" would come out of Ms. Nadel's pocket.

29.    On August 21, 2015, Bucher wrote to Ms. Nadel that UMG proposed a $20,000 marketing budget for one of her new songs, but that Bucher had negotiated with UMG so that Ms. Nadel would only have to cover $5,000 of the marketing budget, he would pay $5,000, and UMG would advance her the other $10,000.

30.    On September 28, 2015, Bucher wrote to Ms. Nadel that UMG still loves her, but they had to push back the TV ads to October.

31.    On September 30, 2015, Bucher wrote to Ms. Nadel that UMG wanted to do a radio push, and Ms. Nadel would have to pay $5,000 a month for five months. Ms. Nadel paid a total of $15,000 for three months for these radio ads.

32.    On December 29, 2015, Bucher wrote to Ms. Nadel that her new album "is amazing!! I want to get everyone at Universal super invested in this

album from marketing all the way down to the interns. I really loved the way the shirts came out that we did for the giveaways. Are you cool to rush 150 more of these . . . to do 150 with rush shipping would only be $425."

33.    Further, Ms. Nadel and Bucher had several conversations where Bucher informed her that UMG was planning on extending her a contract for $250,000 to release her next album. Several emails from Bucher discuss UMG preparing the deal, including Bucher requesting money from Ms. Nadel to buy cigars for the UMG executives as an encouragement for the $250,000 deal.

34.    Specifically, on January 20, 2016, Bucher requested $250 to "surprise the Universal lawyer" who was "setting up our new contract for" between them and UMG for the $250,000. This was the second time he requested money to buy UMG executives cigars.

35.    After each request for money, Ms. Nadel immediately sent Bucher the requested amount by PayPal. However, the contract for $250,000 never materialized. Additionally, to the best of Ms. Nadel's knowledge, UMG never contributed any money towards Ms. Nadel's promotion, and Bucher never supplied her with any evidence that a relationship between Gracie and UMG actually exists.

36.    Outside of UMG, Bucher hired third parties to do PR and radio promotion on Ms. Nadel's behalf. One such PR person was a woman named

Karina who may have worked at Life Word Records. Ms. Nadel was only provided with Karina's email address at lifewordrecords@gmail.com.

37.    Bucher told Ms. Nadel that Karina had secured Ms. Nadel with articles and interview in periodicals such as *The List*, a London based magazine, *Rock & Blues Magazine*, a Japanese based magazine, and *Purple & Yellow Magazine*, a magazine based in Spain. Additionally, according to Bucher, Karina was working towards publishing articles about Ms. Nadel in *Rolling Stone* and *People*.

38.    On September 23, 2015, Bucher wrote to Ms. Nadel that Karina's "been focused on landing bigger reviews and placements for the album coming up as those will really sell us tracks and albums!  Yes People magazine :) very big one!!"

39.    Ms. Nadel sent Karina three payments of $650, totaling $1,950, throughout 2015, for these services. After months of inquiring into Karina and her services, Bucher responded on May 4, 2016, that Karina had died. Bucher told Ms. Nadel that the amount she paid could be refunded because of the circumstances; however, if Bucher actually received a refund, Ms. Nadel never received any money back from Bucher for Karina's services.

40.    Further, no article ever appeared in *Rolling Stone* or *People* regarding Ms. Nadel and her music. Ms. Nadel also performed some personal research on the

other periodicals Bucher mentioned, and Ms. Nadel could not find information as to their existence.

41.    Bucher also requested Ms. Nadel to pay him directly to hire third party radio promoters for her music. On July 14, 2015, Bucher wrote to Ms. Nadel that "I really want to do the Canadian radio push again as well. [the Single] is still selling over 1,000 tracks a week and 40% of all of our sales are from Canada. . . . The total for radio over there like last time is $10k, but I will cover 1/2 of the cost like last time as well so it w ill [sic] only cost you $5k."

42.    Then, on August 28, 2015, Bucher informed Ms. Nadel that her music "already hit the Top 50 on Amazon Canada this morning!!!  I think we should capitalize on this. We can do a promotion and advertise with just Amazon Canada for only $635 for a whole month."

43.    The next day, on August 29, 2015, Bucher said he "[w]oke up to great news we got all of Asia for the Amazon promo!!  EP hit top 75 there and they offered it to us!!  This one is $695 and covers ads and promotions for all of Se ptember [sic].  Again this really reinforces how Universal thinks this thing (like I do as well) can be global!!"

44.    Outside of radio promotion and PR, Bucher had Ms. Nadel pay for physical albums to be created and distributed in countries such as Japan, Spain, and Germany. When first informing Ms. Nadel that there was interest in these countries

for her music, Bucher told Ms. Nadel that all CDs sent to these countries were guaranteed to sell because "[w]ith overseas distribution we are paid on the number that we ship to them directly and there are no returns, so 60 days after we ship we would get paid."

45.    Regarding CD sales in Japan, Bucher first informed Ms. Nadel on September 6, 2015, that a Japanese company was interested. Bucher stated that there was an excellent opportunity in Japan, and Gracie needed money to produce CDs to send to Japan. The first money request was for $2,450 for 1,000 CDs. Following this email, Ms. Nadel paid Bucher the requested amount.

46.    Then, on September 28, 2015, Bucher wrote to Ms. Nadel "I talked to Japan and figured out what they are doing. It's going to be really cool! They are packaging your EP with the new Ellie Goulding album that comes out in November! Basically you buy the Ellie Goulding album and you get a HOT new artist which is you!!" This email was accompanied with an order for an additional 575 CDs.

47.    After several more orders for CDs from Japan, Ms. Nadel ended up paying $19,951.96 to Gracie specifically to create and ship CDs to Japan. However, Ms. Nadel was not paid within the sixty days like Bucher stated, and Ms. Nadel began following up with Bucher regarding the profits for the Japanese deal.

48.    On February 28, 2016, Bucher responded to Ms. Nadel saying "[t]his statement [2nd Quarter 2015] does include the first $4k received from Japan – those checks have started to roll in so more will be on your next statement – as promised that has been and will be very lucrative for us." Then later that day Bucher wrote "I [will] sit down with my accountant on 6/30 and will double check everything and make sure and get you paid sometime in July so you don't wait until the of August for this."

49.    That payment did not come with the statement. Ms. Nadel continued to follow up regarding the payments, and informed Bucher how much she believed she should be due according to how much she paid. On June 17, 2016, Bucher responded to with "I will check this out next week and get on this with my accountant so you get paid before the end of August for this. I need to double check and make sure we've received everything before we do more with them in Japan anyway!"

50.    Then, on July 21, 2016, Bucher wrote to Ms. Nadel, "I know accounting has a check going out to you at end of month. I've been on the phone with Japanese distributor all month. I found out they had only paid us for 1,000 of the CDs and I blew my top. Apparently they were pissed we didn't do the Japan tour last year. Anyway, I've been on it and have collected on 3,000 CDs in the last 2 weeks with the promise that the rest is being wired in August."

51.     Bucher never sent Ms. Nadel that payment in August, nor sent her any payment whatsoever for the CDs she paid to be sent to Japan. After sending a demand letter, Bucher later claimed that the deal had not gone through yet, and was still pending, so there was no money for the Japanese CDs.

52.     After the Japan deal began, Bucher also informed Ms. Nadel that Germany wanted her music as well. Regarding CD sales in Germany, some specific conversations from include:

53.     On September 14, 2015, Bucher wrote to Ms. Nadel that "Germany is in for 1555 units!" Additionally, Germany was giving Ms. Nadel a small advance of $500, and then they would pay "in 60 days from when they receive the product just like Japan."

54.     Ms. Nadel paid Bucher $2,223.65 to produce and ship the CDs to Germany. Gracie did pay Ms. Nadel the $500 advance, which showed up in the second and final statement Gracie sent her, but Ms. Nadel never received any other payments regarding CD sales in Germany.

55.     Collectively, Ms. Nadel sent Bucher and Gracie approximately $129,978.61 under the Distribution Agreement for promotion, PR, and production of CDs. Per the contract, Gracie was required to send quarterly statements along with corresponding payments to Ms. Nadel. However, Gracie only ever sent two statements to Ms. Nadel amounting to $6,127.10.

1

## (The Second Contract – The Promotion Agreement)

2
3
56.    After the Single, Ms. Nadel continued to produce and record new

4
music. As previously mentioned, Bucher sent several emails to Ms. Nadel

5
informing her that he had begun promoting her new music, which included him

6
7
playing her music for UMG executives. The plan, as discussed between Bucher

8
and Ms. Nadel, was that UMG wanted to enter into a new contract with Bucher and

9
that UMG planned to commit $250,000 towards the release and promotion of Ms.

10
11
Nadel's new, full-length album (the "Album").

12
57.    By the end of 2015, Ms. Nadel had completed the album and was

13
14
ready to release the new music. Throughout 2015, Bucher continually requested

15
money from Ms. Nadel so that her music did not lose any momentum that Bucher

16
had allegedly gained on her behalf. However, time continued to pass and the

17
18
contract with UMG for $250,000 never materialized. Going into 2016, Ms. Nadel

19
was afraid she would lose momentum, and continued to ask Bucher the status of

20
21
the new agreement.

22
58.    On April 4, 2016, Bucher wrote to Ms. Nadel "sorry, just saw your

23
note, of course the Universal advance is still a go.  Again, they are tying it against

24
25
me so it really has nothing to do with our contract." and "I literally showed up to

26
my lawyer's office this morning :)  He promised I'd finally have it by

27
Wed.  Lawyers are incredibly annoying, but I will be there Wed. if I don't have it!"

28

59.    Eventually, Bucher began informing Ms. Nadel that Sony Music ("Sony"), not UMG, now wanted to distribute her Album. Like UMG, Sony is one of the world's largest music distributors.

60.    After making the switch from UMG to Sony, Bucher began feeding Ms. Nadel information about how much Sony loved her music, including recaps of his conversations with Sony executives, and posts on his social media regarding Sony loving her Album.

61.    This included an email on May 23, 2016, where Bucher wrote to Ms. Nadel that "[Sony is] dying to do a deal with me and as you've seen have been very helpful in getting me people and things we need and continued to show a great interest in you and the album."

62.    However, like the UMG contract, Bucher continued to stall and the contract with Sony never materialized. After a year and half of Bucher continually pressing her to spend money to keep momentum in her music moving forward, Ms. Nadel began to worry that all the money she spent would be wasted if she did not release something new soon. So in May of 2016, Bucher and Ms. Nadel agreed that she would self-release the first song off of the Album entitled "Armando."

63.    On May 24, 2016, Bucher, through his new company Seven13, executed a new contract with Ms. Nadel's company, Sound Plus, to help promote "Armando" (the "Promotion Agreement"). Seven13, in consideration of a share of

the profits, agreed to help fund the release of "Armando" and committing a minimum of $75,000 towards its promotion.

64.     Around this same time Bucher stopped providing statements under the Distribution Agreement. Because of this, Ms. Nadel required that under the Promotion Agreement she would be able to upload "Armando" herself to a small, independent distribution company and collect any and all revenue. Additionally, Bucher would directly connect Ms. Nadel with his connections for services such as PR and merchandise so she could pay them directly and control how funds were spent on "Armando."

65.     In practice, Bucher would connect Ms. Nadel with his contact and tell both the contact and Ms. Nadel what she needed to order. Then, the contact would invoice Ms. Nadel and she would pay the contact the fee for whatever service or item that Bucher ordered.

66.     Some of these conversations were extremely brief and Ms. Nadel had little to no conversation with the contact. Bucher sometimes did not even provide Ms. Nadel with the contact's name.

67.     One     such     contact     was     the     email     address: tmentertainment@yahoo.com. On May 25, 2016, Bucher told Ms. Nadel that Sony was going to help "Armando" reach 50-60,000 Spotify plays over the next four to five     weeks.     To     do     this,     Bucher     connected     Ms.     Nadel     with

tmentertainment@yahoo.com, and instructed her to send payments to that PayPal account. Bucher stated that "TM works with all the big artists to connect new fans to songs they think they will like. They slowly build your plays but they are real and the only real service I know of."

68.    Ms. Nadel proceeded to pay several $750 payments to that address as requested by Bucher. Later, Bucher stated "I really want to keep TM Entertainment on for these Spotify plays at least while we negotiate this contract.  The numbers have gone up from under 50 listeners a month to almost 4k listeners a month.  It makes us look amazing right now.  Their deal ends next Friday.  Can you re-up them for another month for $750 paypal to tmentertainment@yahoo.com I don't want those Spotify numbers dropping on us at all. Those are most important to us right now.  Soudcloud and YouTube numbers are great, but these are building real plays on real playlists and most important Sony knows if we sign with them they get real $$ from Spotify plays and they can build on it."

69.    Two of Bucher's contacts that Ms. Nadel did have regularly conversations with are Stephanie Gray from Hypeture and Dorian Washington. Hypeture created merchandise and CDs, and was the company used by Bucher under the first Distribution Agreement. Washington provided street team promotional services by taking CDs and other merchandise to the streets and individually promoting Ms. Nadel to people who pass by him.

70.     Regarding street team promotions, Bucher claimed that Washington worked as a music promoter for several major labels and artists. Ms. Nadel first hired Washington for $850 to promote "Armando" in Kentucky. Then Ms. Nadel hired Washington again for $4,630.80 to promote "Armando" in Miami.

71.     In order to perform the street team services, Washington needed merchandise and CDs from Ms. Nadel. Bucher referred Ms. Nadel to Hypeture, which claimed to do have provided merchandise for major artists such as Selena Gomez.

72.     Over the course of a couple months, Bucher would tell Hypeture and Ms. Nadel what merchandise Washington needed. Ms. Nadel would then pay Hypeture for said merchandise, and then Hypeture allegedly shipped the orders to Washington. These orders included, but were not limited to, on May 23, 2016, an order for $3,287.38 worth of merchandise to be sent to Washington; on June 2, 2016, an order for $2,319.95 worth of additional merchandise to be sent to Washington for Miami promotions; and on June 15, 2016, an order for $2,965.00 worth of additional merchandise to be sent to Washington for street team promotions.

73.     In total, including the merchandise and CDs that Ms. Nadel ordered from Hypeture to be shipped to Washington, to other third parties, and to Ms. Nadel herself, Ms. Nadel paid $21,375.34 under the Promotional Agreement.

74.     On July 20, 2016, Bucher sent Ms. Nadel a report from Washington about his street team promotions ("Washington Report"). This Washington Report was the only report Ms. Nadel received regarding Washington's services.

75.     In the Washington Report, Washington described what his team did for Ms. Nadel in Miami. As proof, it contained twelve pictures of random individuals at the beach or a night club holding one of Ms. Nadel's t-shirts or a CD.

76.     When sending the Washington Report, Bucher's exclaimed "[t]hey are covering a ridiculous amount of space in Miami, well above what I've seen him do for the majors. He's really trying to help us break this. I'm also sending this to Sony as well. They will love the detail in this!"

77.     No other reports were ever sent to Ms. Nadel which showed Washington's services even though much of the merchandise which was bought by Ms. Nadel on Washington's behalf was bought and shipped to him after the Washington Report. Excluding the merchandise, Ms. Nadel paid Washington a total of $5,480.80 for his services.

78.     Ms. Nadel paid for $21,375.34 worth of merchandise and CDs from Hypeture and a majority was supposed to be sent to Washington. However, some was supposed to be sent to Ms. Nadel directly. This included orders for t-shirts, CDs, bumper stickers, small and large posters, and sweatshirts.

79.    However, after making these orders and paying Hypeture for all of the merchandise, Ms. Nadel only ever received 60 t-shirts and 20 sweatshirts. Ms. Nadel then contacted Washington and asked what merchandise he received. At that time, Washington informed Ms. Nadel that he only ever received 100 t-shirts from Hypeture even though he and Bucher continued to request more merchandise from Hypeture as if Washington had received everything that was ordered.

80.    Upon discovering the shortage of merchandise to both Washington and herself, Ms. Nadel began sending emails to Gray requesting Hypeture to send the rest of the merchandise. However, after a few emails, Gray stopped responding and the merchandise was never sent. Later, Ms. Nadel was informed that Hypeture was dissolving as a company. Ms. Nadel never received any additional merchandise.

81.    While Bucher was ordering merchandise for Ms. Nadel from Hypeture, Bucher additionally continued to provide radio promotion services for "Armando." On May 20, 2016, Bucher wrote to Ms. Nadel that "I got official word that Armando is being added to the Abercrombie and Fitch playlist in July!!! Great first step!!!"

82.    However, Abercrombie and Fitch's playlist is publicly available, and Armando never appeared on the playlist.

83.    On June 22, 2016, Bucher wrote to Ms. Nadel that he is "[o]n radio calls right now. Pretty sure we have Lexington, KY in San Fran by end of the following week!" Bucher later emailed Ms. Nadel a screenshot of an image that showed five radio plays on four different radio stations. Bucher then claimed to have spent $39,000 on this aforementioned radio promotion. However, no receipts or invoices were ever sent proving what he paid.

84.    In total, Ms. Nadel paid nearly $30,000 under the Promotion Agreement. These costs include tmentertaiment costs, merchandise and CD costs, and street team promotion costs.

85.    Except for stating he paid $39,000 for radio plays, Bucher never presented any evidence that he spent the $75,000 he committed financially for the promotion of "Armando." Hypeture never sent the majority of the $21,375.34 worth of merchandise that Ms. Nadel ordered. Washington never submitted any additional reports that represented his street team services after Washington Report even he continued to request merchandise to promote and Ms. Nadel continued to pay him.

**(Investigation in Defendants)**

86.    Per the Distribution Agreement, Gracie is required to send quarterly statements and payments to Ms. Nadel, as well as to present evidence of how Ms. Nadel's money was spent. However, Gracie only sent Ms. Nadel two statements

and payments, and the last statement and payment was sent in February of 2016 and represented the third quarter of 2015. Since then, five additional quarters have past which Gracie has not sent a statement or payment.

87.    In 2016, Ms. Nadel began requesting records from Gracie that showed the expenditures and how her money was spent by Gracie. Ms. Nadel also began asking specifically about certain deals for which she paid for and that Bucher guaranteed they would make some money, such as the Japanese CD deal.

88.    First Bucher just pushed the conversation back by stating his accountant would have the information soon. Eventually, Bucher just stopped responding to Ms. Nadel, and on September 22, 2016, Ms. Nadel sent Bucher a demand letter demanding statements, payments, and any information regarding so-called expenses and charges.

89.    Following the demand letter, Bucher's mailed a packet of so-called documents that allegedly represented Bucher's expenses. The documents, however, lacked any kind of specificity and are inconsistent with the money both the emails from Bucher requesting money and the actual money Ms. Nadel sent him. No missing statements or payments were sent.

90.    Specifically regarding the Japan deal, Bucher now states that the deal was never finalized and is still pending, so he never received any money from Japan, which is inconsistent with all of his previous emails stating he had received

payment. Further, when asked by Ms. Nadel as to what happened to the CDs and merchandise that Ms. Nadel paid for since apparently the CDs were not sent to Japan, Bucher never supplied an answer.

91.    Finally, after receiving the packet and the inconsistent information from Bucher, Ms. Nadel elected to perform a background check on Bucher, Washington, Karina, Gray, and Hypeture. Following this background check, Ms. Nadel discovered that Gracie went bankrupt the year prior to entering the Distribution Agreement with Ms. Nadel and that neither Gracie nor Seven13 are registered business entities.

92.    For Washington, Ms. Nadel found no evidence connecting Washington to work with the music industry.

93.    For Karina and Life Word Records, the investigation yielded no results of her or the company's existence.

94.    For Hypeture, Ms. Nadel again found no records whatsoever of its existence. This included finding that no business registration for Hypeture ever existed, and that the supplied business address from Gray does not physically exist within the State of Louisiana. Additionally, the Hypeture website began directing Ms. Nadel directly to Vista Print, an online printing website, instead of its normal landing page. Further, the Hypeture domain name is registered under a company that hides its owner's information from the public.

95.    Finally, there are no records of a Stephanie Gray existing in connection with a Hypeture or the supplied email address. The supplied phone number also does not work.

96.    Regarding his relationship with the major labels, Bucher never presented evidence of an actual working relationship with UMG or Sony that could have led to a deal for $250,000. Ms. Nadel reasonably believes no such relationship exists.

97.    Additionally, over the course of two years and several requests, Bucher presented little to no evidence that any of the money Ms. Nadel paid him went towards her music. This includes: the lack of merchandise being shipped, the limited radio plays, the lack of interviews with no refund, the lack of promotional reports; the lack of statements, payments, and records of actual expenditures; and the fact that no evidence exists to the actual existence of several of Bucher's connections.

98.    After performing the investigation, Ms. Nadel reasonably believes that Bucher preyed on her enthusiasm for her music, misled her with praise from UMG, Sony, and other third parties, and colluded with his associates in order to take as much money from Ms. Nadel as possible. Under the two contracts, Ms. Nadel paid Bucher and his associates a total of $151,353.95.

**COUNT I – BREACH OF CONTRACT**
**(DEFENDANT BUCHER OPERATING AS GRACIE)**

99.   Plaintiff Ms. Nadel realleges and incorporates the allegations set forth above in paragraphs 1 through 98 as if set forth herein.

100.   Plaintiff and Defendant entered the Distribution Agreement, on March 12, 2015, for the distribution and promotion of Plaintiff's Single.

101.   Plaintiff performed all of her obligations under the Distribution Agreement.

102.   Defendant breached the Distribution Agreement by: failing to perform contractual services; failing to contribute financially to the support of the Single; failing to provide quarterly income statements and corresponding payments; and failing to provide accurate records of expenditures.

103.   Defendant's breach caused Plaintiff to suffer damages.

## COUNT II – BREACH OF CONTRACT
## (DEFENDANT BUCHER OPERATING AS SEVEN13)

104.   Plaintiff Sound Plus realleges and incorporates the allegations set forth above in paragraphs 1 through 98 as if set forth herein.

105.   Plaintiff and Defendant entered the Promotion Agreement, on May 24, 2016, for the promotion of Ms. Nadel's song "Armando."

106.   Plaintiff performed all of her obligations under the Distribution Agreement.

107.   Defendant's breached the contract by: failing to perform contractual services; and failing to contribute $75,000 towards the promotion of "Armando."

108.   Defendant's breach caused Plaintiff to suffer damages.

## COUNT III – BREACH OF CONTRACT
## (DEFENDANTS HYPETURE, STEPHANIE GRAY, AND DOE)

109.   Plaintiff Ms. Nadel realleges and incorporates the allegations set forth above in paragraphs 1 through 98 as if set forth herein.

110.   Plaintiff and Defendant Hypeture entered into a contract for the manufacturing and sale of certain goods.

111.   Plaintiff paid Defendant for these goods.

112.   Defendant breached the contract by failing to deliver said goods to the Plaintiff and other recipients.

113.   Defendant's breach caused Plaintiff to suffer damages.

## COUNT IV – BREACH OF CONTRACT
## (DEFENDANT WASHINGTON)

114.   Plaintiff Ms. Nadel realleges and incorporates the allegations set forth above in paragraphs 1 through 98 as if set forth herein.

115.   Plaintiff and Defendant entered a contract for the Defendant to perform certain services on behalf of the Plaintiff.

116.   Plaintiffs paid Defendant for these services.

117.   Defendant breached the contract by failing to adequately perform said services.

118.   Defendant's breach caused Plaintiff to suffer damages.

## COUNT V – COMMON COUNT: MONEY HAD AND RECEIVED
### (ALL DEFENDANTS)

119.   Plaintiffs Sound Plus and Ms. Nadel reallege and incorporate the allegations set forth above in paragraphs 1 through 98 as if set forth herein.

120.   Defendants each received money from the Plaintiffs that was intended to be used for the benefit of Plaintiffs.

121.   Defendants did not use the money paid to them by Plaintiffs for the benefit of the Plaintiffs.

122.   Defendants have not given the money back to Plaintiffs.

123.   Accordingly, the Plaintiffs have suffered damages.

## COUNT VI – FRAUD BY INTENTIONAL MISREPRESENTATION
### (ALL DEFENDANTS)

124.   Plaintiffs Sound Plus and Ms. Nadel reallege and incorporate the allegations set forth above in paragraphs 1 through 98 as if set forth herein.

125.   Defendants represented to Plaintiffs that important facts such as, but not limited to, were true: Bucher's success within the music industry; Bucher's connections with major music companies such as UMG and Sony; Gray and Hypeture's actual existence and capabilities; Washington's work with major music companies; and that Plaintiffs needed to continue spending money towards was the benefit of Ms. Nadel's career.

126.   Defendants' representations were false.

127. Defendants' knew that the representations were false when they made them, or the representations were made recklessly and without regard for their truth.

128. Defendants' were aware that co-Defendants' misrepresentations were false, or the co-Defendants' representations were made recklessly and without regard for their truth.

129. The Defendants intended that Plaintiffs rely on the Defendants' representations.

130. Plaintiffs reasonably relied on Defendants' representations and sent the Defendants money.

131. Plaintiffs were harmed when relying on such representations.

132. Plaintiffs' reliance on Defendants' representation were a substantial factor in causing Plaintiffs' harm. Accordingly, Plaintiffs have incurred actual, incidental, and consequential damages according to proof.

## COUNT VII – FRAUD BY NEGLIGENT MISREPRESENTATION (AGAINST ALL DEFENDANTS)

133. Plaintiffs reallege and incorporate the allegations set forth above in paragraphs 1 through 98 as if set forth herein.

134. Defendants misrepresented to Plaintiffs that important facts were true such as the interest in Ms. Nadel's music by third parties.

135. Defendants' representations were false.

136.   Defendants may have honestly believed that the representations was true; however, Defendants had no reasonable grounds for believing the representations were true when Defendants made them.

137.   The Defendants intended that Plaintiffs rely on the Defendants' representations.

138.    Plaintiffs reasonably relied on Defendants' representations and sent the Defendants money.

139.   Plaintiffs were harmed when relying on such representations.

140.   Plaintiffs' reliance on Defendants' representation were a substantial factor in causing Plaintiffs' harm. Accordingly, Plaintiffs have incurred actual, incidental, and consequential damages according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays judgment against Defendants as follows:

1.       For actual damages, according to proof, in excess of $75,000;

2.       For punitive, treble, and/or exemplary damages, as to each of the Defendants, in an amount determined to be appropriate by the court;

3.       For interest on money held by Defendants;

4.       For equitable relief as determined appropriate by the court;

5.       For reasonable attorney's fees according to proof awarded;

6.       For costs of suit; and

7.    For such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs request trial by jury.


Dated: February 28, 2017          THE LAW OFFICE OF
                                  ALLEN KRONENBERGER

                                  s/Allen Kronenberger II, Esq.
                                  By: Allen Kronenberger #297194
                                  Attorney for Plaintiffs
                                  THE LAW OFFICE OF ALLEN
                                  KRONENBERGER
                                  7083 Hollywood Blvd. 4th Fl.
                                  Los Angeles, CA 90028
                                  Telephone: (213) 618.0923
                                  Fax: (213) 402.3323
                                  Email: allen@akronenberger.com